**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LISA JILL BILAK, | Civil Action No. 2:12-CV-05956 |
| Plaintiff, | |
| v. | |
| Carolyn W. Colvin, <br> COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | August 9, 2013 |

**WIGENTON**, District Judge.

Before this Court is Plaintiff Lisa Jill Bilak's ("Plaintiff") appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge Leonard Olarsch's ("ALJ") denial of Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 405(g). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(g). Venue is proper pursuant to 28 U.S.C. § 1391(b). For the reasons stated herein, this Court **AFFIRMS** the ALJ's decision.

**I. FACTS AND PROCEDURAL HISTORY**

  *a. Work History*

Plaintiff is a 43-year-old woman with a Bachelor of Arts degree in Environmental Studies from Ramapo College in New Jersey. (*See* R. at 17, 26, 27.) Plaintiff's main job was working as a quality assurance manager for a pharmaceutical company for nine years, i.e. 1999-2008. (*See id.* at

27.) Plaintiff's responsibilities included, among other things, overseeing the quality assurance of production and manufacturing. (*See id.*)

On August 23, 2008, Plaintiff was terminated from her employment at the pharmaceutical company due to issues she had with management. (*See id.* at 30.) In November 2008, Plaintiff began a new job with Actavis Pharmaceuticals in Elizabeth, NJ, where she worked as a quality assurance manager. (*See id.* at 30, 31.) In December 2008, Plaintiff was terminated from her employment with Activis. (*See id.* at 31.)

    b. *Medical History*

From July 2004 to May 2009, Plaintiff made primary care visits with Thomas Kaylen, MD, ("Dr. Kaylen"). (*See id.* at 160-168, 226, 284-294, 313-323.) On April 19, 2007, Dr. Kaylen referred Plaintiff to David Lessing, MD, ("Dr. Lessing"), for right shoulder and right wrist pain. (*See id.* at 154.) Upon examination, Dr. Lessing noted that Plaintiff had a "right wrist dorsal ganglion cyst and right shoulder tendonitis with periscapular scarring" and ordered a Magnetic Residence Imaging (MRI) of her right shoulder. (*Id.*) The MRI, which was conducted on April 27, 2007, indicated mild supraspinatus tendinosis. (*See id.* at 154-55.)

On May 15, 2007, Plaintiff followed up with Dr. Lessing after a May 5, 2007 MRI of her lower back.[1] (*See id.* at 153.) Dr. Lessing's clinical impression was that Plaintiff had a herniation at L5-S1, "numbness on the lateral posterior leg in the [fourth] and [fifth] toes" and an unremarkable straight leg raising. (*Id.*)

On June 26, 2007, Plaintiff visited Scott R. Shepard, MD, ("Dr. Shepard") for a neurological consultation. (*See id.* at 216.) Plaintiff complained to Dr. Shepard of lower back pain and left lower extremity pain and numbness. (*See id.*) Dr. Shepard reviewed Plaintiff's May 5, 2007 MRI,

---

[1] Specifically, the MRI revealed Marked type II degenerative endplate changes at L5-S1, disc bulge/pseudo superimposed on Grade I retrolisthesis at this level with mild overall canal narrowing and mild bilateral foraminal narrowing, possible presence of a tiny superimposed midline protrusion posterior to the S1 vertebral body, and probable partial lumbarization of the S1 vertebral body. (*See id.* at 157-58.)

2

conducted a physical examination of Plaintiff, and noted that Plaintiff had normal range of motion on flexion and extension and lateral bending of the cervical and lumbar spine, a negative straight leg raising bilaterally, intact motor and sensory examinations, and that her gait and tandem gait were within normal limits. (*See id.* at 217.)

On January 29, 2008, Plaintiff visited Dr. Eric D. Freeman ("Dr. Freeman") complaining of lower back and left hip pain. (*See id.* at 391.) Dr. Freeman noted that Plaintiff "ha[d] been treated in the past for her low back pain [and that the pain radiated down her left lower extremity.]" (*Id.*) Dr. Freeman's clinical impression of Plaintiff was that she had "left lumbar radiculitis secondary to lumbar disc herniation." (*Id.*)

On April 2, 2008, Plaintiff returned to Dr. Freeman, reporting that she still had lower back and left hip pain even after three steroid epidural injections. (*See id.* at 389.) Dr. Freeman ordered another MRI in order to obtain an update from Plaintiff's previous May 5, 2007 MRI. (*See id.* at 390.) This MRI was conducted on April 21, 2008. (*See id.* at 395.) The MRI demonstrated that Plaintiff had "left lumbar radiculitis secondary to severe degenerative disc disease at L5-S1".[2] (*See id.* at 387, 395.)

On March 25, 2009, Plaintiff underwent a cervical spine MRI. On April 13, 2009, Plaintiff visited Dr. Freeman again. (*See id.* at 372.) Dr. Freeman noted that the MRI demonstrated multilevel cervical degenerative disc disease with disc herniation in foraminal narrowing and stenosis.[3] (*See id.* at 373.) His clinical impression was that Plaintiff had right cervical radiculitis and cervical degenerative disc disease with associated disc herniation. (*See id.*) He advised

---

[2] Specifically, the MRI of Plaintiff's lumbar spine showed the following at L5-S1: Mild Grade "I retrolisthesis of L5 on S1," "reactive endplate changes, posterolateral disc bulging extending into the entry zones," and "neural foramina bilaterally with moderate left and mild to moderate right-sided entry zone neural foraminal narrowing not significantly changed" from Plaintiff's previous May 4, 2007 MRI results. (R. at 395.)

[3] Specifically, the MRI revealed disc bulging at C2-3, C3-4, and C6-7 and spondylosis at C4-5 and C5-6. (*See id.* at 208, 394.) "[A]t C4-5 there [was] central left paramedian disc osteophytes seen mildly compressing the spinal cord contributing to mild central stenosis." (*Id.* at 208.) There [was] also a showing of disc bulging at C6-7 and multilevel foramina compromise. (*See id.*)

3

Plaintiff to continue taking Lyrica, made adjustments to her dosage of Norco, and decided to move forward with a right C7-T1 epidural steroid injection. (*See id.*)

On May 11, 2009, Plaintiff revisited Dr. Freeman. (*See id.* at 370.) She indicated that she had a new problem of extreme weakness, numbness and tingling in her left upper extremity, which radiated into the first and second digits of her left hand and caused her to drop objects. (*See id.*) A left upper extremity examination revealed 3+ weakness in the left wrist, but the remainder of the exam was negative. (*See id.* at 371.) Dr. Freeman's clinical impression was that Plaintiff had extreme left upper extremity weakness. (*See id.*) As a result, he treated Plaintiff with Medrol Dosepak. (*See id.*)

On June 1, 2009, Plaintiff visited Dr. Freeman and reported a 50% improvement regarding her cervical spine. (*See id.* at 368.) Dr. Freeman noted that Plaintiff had less numbness and improved strength in her left upper extremity. (*See id.*)

On June 20, 2009, Plaintiff reported a new onset of left-sided wrist weakness, but denied any trauma. (*See id.* at 366.) Dr. Freeman observed left upper extremity wrist-drop and provided Plaintiff with a prescription of prednisone Dosepak. (*See id.* at 367.) On July 3, 2009, Plaintiff sought emergency room treatment at JFK Medical Center because she had "no control over [her] left hand," and had left arm numbness. (*See id.* 324-30.) Plaintiff's examination was normal except for left wrist drop. (*See id.*) On August 13, 2009, Dr. Freeman indicated that Plaintiff had a left wrist drop, but could use her left arm. (*See id.* at 258.) Dr. Freeman also noted that Plaintiff could walk at a reasonable pace. (*See id.* at 257.)

On October 21, 2009, in response to further complaints of pain in the cervical and lumbar regions of her back, Dr. Freeman provided Plaintiff with a new prescription of Opana ER and Skelaxin, decreased her dosage of Norco, and continued her on the same dosage of Lyrica. (*See id.* at 361-62.) On November 18, 2009, Plaintiff followed up with Dr. Freeman. (*See id.* at 358.) Dr.

4

Freeman noted that the medications he prescribed Plaintiff during her previous visit enabled her to perform her physical and social functions. (*See id.*)

On December 16, 2009, Plaintiff returned to Dr. Freeman complaining of left-sided neck and lower back pain. (*See id.* at 355.) Dr. Freeman examined Plaintiff's cervical and lumbar regions and noticed lumbar radiculitis secondary to lumbar degenerative disc disease at L5-S1, cervical degenerative disc disease, cervical and lumbar myofascial pain. (*See id.* at 356.) Dr. Freeman also noticed improvement of left upper extremity wrist-drop. (*See id.*) Furthermore, Dr. Freeman observed a positive slump and straight leg raise for Plaintiff's back and buttock, and leg pain on the left side. (*Id.*) Dr. Freeman took Plaintiff off of Opana, started her on Embeda, and continued her on Norco, Lyrica, and Skelaxin. (*See id.* at 357.)

On January 15, 2010, Plaintiff complained to Dr. Freeman of an intermittent dull aching neck and lower back pain, which she rated as 5 out of 10 on a pain scale; however, Dr. Freeman indicated that Plaintiff's back condition remained unchanged. (*See id.* at 352, 353.) Subsequently, on March 17, 2010, Dr. Freeman conducted a follow-up examination of Plaintiff and indicated that her wrist drop had completely resolved itself. (*See id.* at 350.)

On May 20, 2010, in response to Plaintiff's additional complaints of pain in the cervical and lumbar regions of her back, Dr. Freeman increased Plaintiff's dose of Embeda and advised her to continue with Norco, Lyrica, and Skelaxin. (*See id.* at 354.)

On March 18, 2010, State agency consultant Dr. McLarnon completed a Residual Functional Capacity ("RFC") assessment of Plaintiff. (*See id.* at 298-305.) Dr. McLarnon assessed that Plaintiff could lift and carry ten pounds frequently, stand and walk three to four hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had no limitations in pushing and pulling. (*See id.* at 299.) Dr. McLarnon also reported that Plaintiff could perform all postural functions occasionally, could reach overhead occasionally, and reach in all other directions

5

frequently. (*See id.* at 300, 301.) Dr. McLarnon noted that Plaintiff's left wrist weakness was expected to improve. (*See id.* at 301.) Also, he found that Plaintiff had no communicative limitations but some environmental limitations such as avoiding concentrated exposure to extreme cold, extreme heat, and wetness and moderate exposure to vibration and hazards (i.e., machinery, heights, etc.). (*See id.* at 302.) Dr. McLarnon reported that his assessment of Plaintiff's RFC was based on a December 2009 orthopedic examination provided by Dr. Freeman. (*See id.* at 305.)

On August 18, 2010, Plaintiff underwent a steroid epidural injection at S1. (*See id.*) On September 3, 2010, Plaintiff reported to Dr. Freeman that she was at 70% improvement and wished to move forward with another epidural steroid injection. (*See id.* at 336.) Dr. Freeman noted that Plaintiff's lumbar range of motion had improved, that Plaintiff was able to heel, toe, and tandem walk without an assistive device, that Plaintiff had negative straight leg raise and slump tests, and that Plaintiff had improvement with extension, rotation, and flexion. (*See id.* at 336-37.)

On October 8, 2010, Plaintiff reported to Dr. Freeman that she was still 70% improved but stated that the second epidural steroid injection conducted on September 15, 2010, did not result in significant improvement. (*See id.* at 331.) Dr. Freeman noted that Plaintiff had normal flexion, extension, side-bending and rotation with minimal tenderness in the lumbar paraspinal muscles bilaterally, and that straight leg raise and slump tests were negative. (*See id.* at 332.)

On October 20, 2010, Dr. Kaylen completed an RFC assessment of Plaintiff. (*See id.* at 308-12.) On the RFC assessment form, Dr. Kaylen indicated that Plaintiff had seen him monthly. (*See id.* at 308.) Additionally, Dr. Kaylen diagnosed Plaintiff with degenerative joint disease and cervical and lumbar radiculopathy and indicated that she had chronic neck and back pain with decreasing sensation and motor strength in the left hand. (*See id.*) Dr. Kaylen indicated that Plaintiff had constant discomfort in her neck and lower back, which got worse with increasing activity and that Plaintiff had weakness in her left fingers and left leg. (*See id.*) Dr. Kaylen also

6

indicated that Plaintiff was taking medicine that made her incoherent and that Plaintiff's impairments lasted or were expected to last at least twelve months. (*See id.*) Dr. Kaylen indicated that depression and anxiety were emotional/psychological factors contributing to the severity of Plaintiff's symptoms, functional limitations, and physical condition. (*See id.* at 309.) Dr. Kaylen opined that Plaintiff was also constantly experiencing pain and other symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks. (*See id.*) Dr. Kaylen indicated that Plaintiff was incapable of tolerating "low stress" jobs because she could not sit or stand for more than 15 minutes total and that Plaintiff could sit, stand, and walk for less than two hours in an eight-hour work day. (*See id.* at 310.) Dr. Kaylen further indicated that Plaintiff must walk every ten minutes for a period of ten minutes during an eight-hour work day, that she needs a job that permits shifting positions at will from sitting, standing or walking. (*See id.*) Plaintiff would also need to take unscheduled breaks every half hour to an hour for forty-five minutes to an hour during an eight-hour working day. (*See id.*) Dr. Kaylen also indicated that Plaintiff must use a cane or assistive device while engaging in occasional walking and that she can never carry more than ten pounds. (*See id.*) Additionally, Dr. Kaylen concluded that Plaintiff could rarely look down (sustained flexion of neck), turn her head right or left, twist, stoop (bend), or crouch/squat. (*See id.* at 311.) He found that Plaintiff could occasionally look up and climb stairs, and that Plaintiff could never climb ladders. (*See id.*) Moreover, Dr. Kaylen indicated that Plaintiff had significant limitations with reaching, handling and/or fingering in her left upper extremity. (*See id.* at 311.) He further concluded that Plaintiff's impairments were likely to produce "good days" and "bad days," and that on average she was likely to be absent more than four days per month from work due to her impairments and treatment. (*See id.*) Lastly, Dr. Kaylen indicated that Plaintiff had further limitations that would affect her ability to work at a regular job on a sustained basis, e.g.,

7

Plaintiff had severe allergic rhinitis and should avoid wetness, humidity, dust, fumes and gases. (*See id.* at 312.)

On November 24, 2010, Dr. Freeman ordered an MRI of Plaintiff's cervical spine. (*See id.* at 392.) The MRI revealed degenerative disc disease at the C4-5, C5-6, and C6-7 levels, a significant decrease in the previous herniation to the left of midline at C4-5, with persisting foraminal narrowing particularly on the right side, and unchanged mild spinal stenosis. (*See id.*) The MRI also showed a probable small herniation at the entrance of the neural foramen on the left, a probable small herniation on the right at C6-7 level with findings consistent with progression of degenerative disc disease at this level, and reversal of the curvature. (*See id.* at 392, 393.)

### c. Procedural History

On April 30, 2009[4], Plaintiff filed an application for SSI benefits alleging that she had been unable to work since August 23, 2008, due to cervical and lumbar disc herniations and bulges causing spinal cord compression. (*See id.* at 119.) On December 14, 2009, the Commissioner denied Plaintiff's application. (*See id.* at 53-54, 278.) Subsequently, Plaintiff filed for reconsideration of her denial with the Commissioner.[5] On March 20, 2010, the Commissioner denied Plaintiff's application for SSI benefits again. (*Id.* at 58.). On April 1, 2010, Plaintiff appealed the Commissioner's decision to the Office of Administrative Law. (See i*d.* at 61.)

On December 9, 2010, the ALJ conducted a hearing regarding Plaintiff's appeal. (*See id.* at 10.) On January 11, 2011, the ALJ denied Plaintiff's appeal and issued his decision. (*See id.* at 18.) On March 5, 2011, Plaintiff sought review of the ALJ's decision from the Social Security Appeals Counsel ("Appeals Counsel"). (*See id.* at 6, 151.) On August 6, 2012, the Appeals Counsel denied

---

[4] The ALJ's decision indicates that Plaintiff filed for SSI benefits on April 27, 2009; however, the record reflects that Plaintiff actually filed for SSI benefits on April 30, 2009. (*See* R. at 95.)
[5] The record does not indicate the exact date that Plaintiff filed her request for reconsideration of her denial.

Plaintiff's request for review. (*See id.* at 1-4.) On September 23, 2012, Plaintiff filed an appeal with this Court challenging the ALJ's decision. (*See* Compl.)

## II. LEGAL STANDARD

In social security appeals, the District Court has plenary review of the legal issues decided by the Commissioner. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). Yet, this Court's review of the Commissioner's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938)). Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x. 613, 616 (3d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x. at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). In essence, "the Commissioner's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x. 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979)

(quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D.Pa. 1976)). However, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

## III. DISCUSSION

### a. *The SSDI Test*

An individual will be considered disabled under the Social Security Act (the "Act") if he or she is unable to "engage in any substantial gainful activity ("SGA") by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months. 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be severe enough to render the individual "not only unable to do his previous work but [unable], considering his age, education, and work experience, [to] engage in any kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A claimant must show that the "medical signs and findings" related to her ailment have been "established by medically accepted clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . ." *Id*.

In order to establish a prima facie case of disability under the Act, a plaintiff bears the burden of demonstrating: (1) that she was unable to engage in SGA by reason of physical or mental impairment that could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment was demonstrated by evidence supported by medically acceptable clinical and laboratory techniques. *See* 42 U.S.C. § 1382c (a)(3).

In determining disability, the Social Security Administration (SSA) utilizes a five-step sequential analysis. *See* 20 C.F.R. § 416.920; *see also Cruz*, 244 F. App'x. at 479. A determination

of non-disability at steps one, two, four, or five in the five-step analysis ends the inquiry. *See* 20 C.F.R. § 416.920. A determination of disability at steps three and five results in a finding of disability. *See id.* Contrarily, if an affirmative answer is determined at steps one, two, or four the SSA proceeds to the next step in the analysis. *See id.*

At step one, the Commissioner must determine whether the claimant is engaging in SGA. *See* 20 C.F.R. 416.920(b). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. *See* 20 C.F.R. 416.972(a). "Gainful work activity" is work that is usually done for profit, whether or not profit is realized. *See* 20 C.F.R. 416. 72(b). If an individual engages in SGA, he is not disabled regardless of the severity of his physical or mental impairments. *See id.* If the individual is not engaging in SGA, the Commissioner proceeds to the next step. *See id.*

At step two, the Commissioner must determine whether the claimant has a medically determinable severe impairment or a severe combination of impairments. *See* 20 C.F.R. 416.920(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. *See* 20 C.F.R. 416.921. An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or combination of abnormalities that would have a minimal effect on an individual's ability to work. *See id*; *see also Bowen v. Yuckert*, 482. U.S. 137, 149-51 (1987). If the claimant does not have a severe impairment or severe combination of impairments, he is not disabled. *See* 20 C.F.R. 416. 972(c). If the claimant has a severe impairment or severe combination of impairments, the analysis proceeds to the third step. *See id.*

At step three, the Commissioner must determine whether the claimant's impairment or combination of impairments meets the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P Appendix 1. *See* 20 C.F.R. 416.920(d), 416.925, 416.926. If the claimant's impairment

or combination of impairments meets all the criteria of a listing and the duration requirement, the claimant is disabled. *See* 20 C.F.R. 416.920(d), 20 C.F.R. 404.1525(c)(3); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If the claimant does not, the analysis proceeds to the next step. *See* 20 C.F.R. 416.920(d).

After step three, but before considering step four, the Commissioner must first determine the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. 416.920(e); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. *See* 20 C.F.R. 404.1545. In making this determination, the Commissioner must consider all of the claimant's impairments, including impairments that are not severe. *See* 20 C.F.R. 416.920(e), 416.945. As trier of fact, the Commissioner has discretion to weigh all the evidence, and resolve material conflicts. *See* 20 C.F.R. 404.1527. Thus, a RFC must include a resolution of any inconsistent views in the evidence. *See* SSR 96-8. This requires the Commissioner to explain why a particular opinion was not adopted, when his assessment conflicts with an opinion from a medical source. *See id.*

At step four, the Commissioner must determine whether the claimant has the RFC to perform the requirements of his past relevant work. *See* 20 C.F.R. 416.920(f). "Past relevant work" means work performed within the fifteen years prior to the date that disability must be established. *Id*. If the claimant has the RFC to perform his past relevant work, the claimant is not disabled. *See id*. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth step. *See id.*

At step five, the Commissioner must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience. *See* 20 C.F.R. § 416.920(g). The claimant bears the burden of persuasion in the first four steps. *See Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x. 761, 763 (3d Cir. 2009). If the claimant establishes that his impairment prevents him

12

from performing any of his past work, the burden shifts to the Commissioner at step five to determine whether the claimant is capable of performing alternative, substantial gainful activity present in the national economy. *See* 20 C.F.R. § 416.920(g); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987).

  b. *ALJ's Findings*

At step one, the ALJ found that Plaintiff had not been engaged in SGA since August, 23, 2008, the alleged onset date. (*See* R. at 12.) At step two, the ALJ found that Plaintiff had "the following severe impairment: degenerative disc disease of the cervical and lumbar spine." (*Id.*) At step three, the ALJ found that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (*Id.*) At step four, the ALJ determined Plaintiff to have "the RFC to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a)" of the Act and found that Plaintiff was "unable to perform past relevant work." (R. at 12, 16.) Finally, at step five, the ALJ considered Plaintiff's age, education, work experience, and RFC and found that Plaintiff was able to perform work in sedentary jobs that existed in significant numbers in the national economy. (R. at 17.)

On appeal, Plaintiff only takes exception to steps two, three, and four of the ALJ's decision.

  c. *Analysis*

  i. Step Two

Plaintiff argues that the ALJ misinterpreted the record and failed to consider her impairments of insomnia, depression, anxiety, asthma, and gastrointestinal complaints. (*See* Pl.'s Br. 21-22.) The Commissioner, however, correctly points out that Plaintiff did not include any of these impairments as a basis for disability on her application for SSI benefits. (*See* Def.'s Br. 17.) Furthermore, the Commissioner argues that Plaintiff has provided no explanation demonstrating

13

that any of the aforementioned impairments were medically determinable, severe, and met the durational requirement," pursuant to 20 C.F.R. § 404.1509. (*Id.*) Indeed, Plaintiff's testimony before the ALJ as to her insomnia and depression was very minimal and her testimony as to her anxiety, asthma, and gastrointestinal complaints was nonexistent.[6] (*See* R. at 32-46.) Where a claimant does not provide sufficient evidence to show that particular impairments have more than a minimal effect on her ability to work, the ALJ can properly omit such impairments from the step two analysis. *See Ibanibo v. Comm'r of Soc. Sec.*, Civ. No. 11-3822 (CCC), 2012 WL 294578, at *6 (D.N.J. July 18, 2012). Therefore, since there is minimal evidence as to Plaintiff's insomnia, depression, anxiety, asthma, and gastrointestinal complaints, this Court finds that the ALJ did not err in omitting these impairments from his step two analysis.

        ii.      <u>Step Three</u>

Plaintiff makes two arguments regarding the ALJ's step three finding. First, Plaintiff contends that the ALJ, in his step three analysis, improperly considered medical evidence including Plaintiff's MRI results and objective clinical findings. (*See* Pl.'s Br. 19.) Second, Plaintiff contends that the ALJ did not develop the record properly by including findings that [Plaintiff's] impairments do[] not meet or equal [] any impairments described in the Listing of Impairments." (*See* Pl.'s Br. 20. (citing S.S.R. 82-56))

At step three, the ALJ found that "[t]he medical evidence does not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis under listing 1.04," and that "the specified criteria required of the listing were not demonstrated by the available medical evidence."[7] The ALJ's finding was proper. The medical evidence in the record

---

[6] Furthermore, Dr. Kaylen indicated that apart from her cervical radiculopathy, Plaintiff had no other conditions that limited her ability to perform work-related activities. (*Id.* (citing R. at 282.))

[7] In order to meet listing 1.04 under subsection A, a plaintiff is required to demonstrate as follows:

14

demonstrates that Plaintiff does not have "1) the required neuro-anatomic distribution of pain, 2) limitation of motion in the spine, 3) motor loss accompanied by sensory or reflex loss, and/or 4) positive straight leg raising as required to meet the other criteria of listing 1.04.A. (*See* R at 12.) Therefore, Plaintiffs argument fails and the ALJ's step three findings are supported by substantial evidence in the record.

      iii.  RFC Assessment & Step Four

Regarding the ALJ's RFC determination, Plaintiff argues that "the ALJ failed to give proper credence to [her] complaints . . . concerning her chronic and severe pain, with radiculopathy to both upper and lower extremities, numbness, weakness and limitations of motion and function." (Pl.'s Br. 14.) Plaintiff argues that her testimony regarding her inability to work is entitled to great weight as it is supported by and is consistent with the evidence in the record. (*See id.* at 15.) This Court finds Plaintiff's arguments unpersuasive.

"[A] Plaintiff bears the burden of demonstrating that her subjective complaints [are] substantiated by medical evidence." 42 U.S.C.A. § 401 et seq; *see also Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *Pearson v. Barnhart*, 380 F. Supp. 2d 496 (D.N.J. 2005). Here, the ALJ determined that Plaintiff had "the RFC to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a)" of the Act and at step four found that Plaintiff was "unable to perform past relevant work." (R. at 12, 16.) In his RFC assessment, the ALJ noted Plaintiff's daily living activities, e.g., driving to the grocery store to shop, driving around town, doing crafts and painting and selling them at street fairs as an indicator that Plaintiff's subjective complaints of pain

---

   1.04 *Disorders of the Spine* (e.g., herniated nucleus pulposus, spinal arachnoidits, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
A. Nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

15

were inconsistent with her statements that she could not perform sedentary work. (*See* R. at 16, 25-26, 39-41.) The ALJ's credibility determination is supported by objective medical evidence showing that Plaintiff's physical examination findings consistently showed normal sensation, reflexes, and motor functioning. (*See id.* at 211, 327, 331-32, 337, 347, 350, 355-56, 359, 362, 368, 371-72, 375, 387, 389, 391.) Furthermore, the ALJ's credibility findings and resultant RFC assessment are supported by the medical evidence produced by Dr. Freeman and the RFC assessment of Dr. McLarnon, which concluded that Plaintiff's impairment did not render her incapable of performing any type of work. Accordingly, this Court finds that the ALJ properly evaluated Plaintiff's subjective medical complaints given the evidence in the record.

Plaintiff also argues that, in assessing her RFC, the ALJ gave too much weight to Dr. McLarnon's medical opinion and improperly rejected the opinions of her treating physicians, Dr. Freeman and Dr. Kaylen. (*See* Pl.'s Br. 22.) This Court disagrees; the ALJ did not reject the opinion of Dr. Freeman and Dr. Kaylen. In fact, the ALJ used their opinions in his analysis.

Dr. Freeman repeatedly observed that Plaintiff's medical conditions enabled her to perform her physical and social functions. (*See* R. at 331, 336, 349, 358, 370, 375, 379-80, 382, 386.) Additionally, Dr. Freeman's pain management notes indicate that Plaintiff improved with treatment and that Plaintiff ruled her intermittent pain as moderate. (*See id.* at 16.) Dr. Kaylen completed an assessment form, where, among other things, he stated that Plaintiff had no conditions other than cervical radiculopathy that limited her ability to perform work-related activities. (*See id.* at 281-82.)

To the extent that Plaintiff takes issue with the ALJ's decision to not consider Dr. Kaylen's RFC assessment, the ALJ properly noted that "treating physician opinion[s] [are] given controlling weight only if [they] are well supported and not inconsistent with other substantial evidence." (*Id.* at 16; *See also* 20 C.F.R. §§ 404.1529, 416.929) The ALJ properly considered Dr. Kaylen's second RFC assessment and found it was "not supported by objective clinical findings and [was]

inconsistent with other substantial evidence" in the record.[8] (*Id.* at 16.) Thus, this Court finds that the ALJ, in making his RFC assessment, did not improperly reject Dr. Kaylen's medical opinion. Contrary to Plaintiff's indication, the ALJ did not reject Dr. Freeman's opinion, but instead relied on it in reaching a decision.[9] Accordingly, Plaintiff's arguments regarding the RFC determination and step four are also unavailing.[10]

## IV. CONCLUSION

For the foregoing reasons, this Court **AFFIRMS** the ALJ's decision.

s/Susan D. Wigenton, U.S.D.J.

Orig: Clerk
Cc: Parties

---

[8] Furthermore, the ALJ explained that Dr. Kaylen's opinion that Plaintiff needed a cane to ambulate was an inconsistency with the record because there is no medical evidence that Plaintiff had any abnormality in her gait. (R. at 16, 211, 305, 310, 346, 349, 353, 355, 361.)
[9] Plaintiff further argues that the ALJ's reliance on Dr. McLarnon's opinion is improper because the opinion is not dated. (Pl.'s Br. 17.) This argument, however, is factually false as the Dr. McLarnon completed a case analysis on September 4, 2009, and subsequently completed a Physical RFC Assessment on March 18, 2010. (R. at 269, 298-305.)
[10] Moreover, Plaintiff argues that the ALJ erred at step five in that he failed to obtain a medical vocational expert for Plaintiffs non-exertional limitations, e.g., insomnia, depression, and anxiety. However, given this Court's conclusion that the ALJ properly found these impairments not to be severe, Plaintiff's argument is moot.